THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE CARRASQUILLO, Appellant.

First Department, April 21, 1988

APPEARANCES OF COUNSEL

*Nancy Tegtmeier-Sunshine* of counsel *(Vija Kemanis* and *Norman Barclay* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Sara Bennett* of counsel *(Philip L. Weinstein,* attorney), for appellant.

**OPINION OF THE COURT**

SULLIVAN, J.

Defendant was convicted by a jury of manslaughter in the

second degree and sentenced to an indeterminate term of imprisonment of from 1⅓ to 4 years for the death of Dominick Barberi after a vicious beating in which both he and Robert Turner participated.* The case, however, was submitted to the jury, which so found, on the theory that defendant's actions were the sole cause of death. Defendant's argument that the People failed to prove beyond a reasonable doubt that he, not Turner, struck the fatal blow is well taken. Accordingly, we reverse and dismiss the indictment.

Barberi and Richard Nenning were next door neighbors in Queens. As former heroin users, they both received treatment at, albeit different, methadone clinics in Manhattan. On March 29, 1983, they went together, first to Nenning's clinic at 37th Street and Eighth Avenue and then to Barberi's clinic, further downtown. At some point, they both took two Valium tablets.

On their way to the subway home, some time before 11:00 A.M., they passed by the La Fontaine Boutique on Sixth Avenue near 21st Street, where Barberi saw a sweater he liked on one of the outdoor display racks. At Barberi's suggestion, Nenning went inside the boutique to check on the employees. After Nenning came back out and told Barberi that the employees were drinking coffee, Barberi took the sweater off the rack, held it up to himself and then rolled it up and put it in a bag he was carrying.

Suddenly, a man, described as being over six-feet tall and weighing more than 200 pounds, and subsequently identified as Robert Turner, an employee, came "out of nowhere from the street side", and struck Barberi, who was only five-feet, eight-inches tall and weighed less than 120 pounds, in the head with a lead pipe, causing him to fall face forward to the ground. At about the same time defendant and another Hispanic man came running out of the boutique. Defendant joined Turner, and began hitting Barberi with a stick, described as about four feet in length.

Nenning, who was himself being restrained by the other Hispanic man, saw defendant "swinging that club" for about 5 to 7 minutes, hitting Barberi repeatedly "from head to toe" and striking him on the head, shoulders and sides. During the beating, defendant and Turner turned Barberi over on his

* Turner, who was separately charged with attempted assault in the second degree, pleaded guilty to assault in the third degree and was sentenced to a conditional discharge.

back and moved him into "different positions" with their feet, spreading his legs and beating him inside them. As a crowd gathered and the assault ended, blood suddenly "shot out" of Barberi's head. After breaking free, Nenning picked up the heavily bleeding Barberi and flagged down a taxicab. A responding police car escorted the taxicab to Bellevue Hospital, where Barberi was given emergency treatment.

Barberi complained to the nurse and doctor of having been hit in the head, upper back, upper thigh and right hand with a baseball bat, and told them that he had experienced a few seconds loss of consciousness. The doctor noted a three-inch laceration on the back of his head, between the left ear and middle of the head, extending in depth down to the skull as well as a hematoma, or blood clot, under the wound. In light of Barberi's possible loss of consciousness, the doctor observed, the injury was potentially fatal. The doctor also noted bleeding on Barberi's right hand over the fifth metacarpal. After the head laceration was sutured and dressed and a hand fracture set in a cast, Barberi was permitted to go home.

Two days later, at about 2:30 P.M., Barberi was found sitting on the curb at the intersection of Sixth Avenue and 48th Street in Manhattan, his head wound uncovered, and speech slurred. He was taken, unsteady on his feet, to St. Clare's Hospital emergency room, where he was administered intravenous medication in an effort to bring down his blood pressure, which was quite high, 220/120. Noting that Barberi carried a methadone card, the doctor also administered Narcain, a drug to counteract the effects of opiate overdose. Within minutes Barberi stopped breathing and was attached to a ventilator to continue his breathing artificially.

Once these emergency procedures were undertaken, the doctor noticed the injury on Barberi's head. She also observed that after Barberi had gone into respiratory arrest his left pupil became larger than his right one, indicating that he had hemorrhaged because of high blood pressure and the head injury. Based on a preliminary diagnosis of respiratory arrest due to drug overdose and the head injury, blood tests were ordered. The toxicology report, however, did not reveal the presence of any narcotic substances in Barberi's blood. Barberi was removed to the intensive care unit in a deep coma and in a state of brain death. He died on April 17th.

On autopsy, the sutured head wound, which showed evidence of healing, appeared to have resulted from only one

blow, which could have been delivered by either a wooden stick or metal pipe. The location of the injury ruled out as its cause a fall. Hemmorrhaging had occurred under the head wound, between the scalp and the skull, and between the skull and the brain, both over and under the membrane covering the brain. The latter types of hemorrhage are known as "epidural" and "subarachnoid hematoma", respectively. The skull had not been fractured. The .brain was mushy and semi-liquid, a condition known as "anoxic cerebral necrosis".

According to the medical evidence, epidural hematoma is caused solely by the application of force to the head sufficient to rupture an artery inside the skull. After sustaining such trauma, a victim may act normally for a period of hours or even days, but will eventually begin to exhibit symptoms similar to intoxication, such as weakness in the limbs and changes in the eyes' reaction to light and movement. Ultimately, the pressure of the blood on the brain causes loss of consciousness and brain death. In Barberi's case the epidural hematoma which he suffered was sufficient to cause brain death and anoxic cerebral necrosis. Once he suffered brain damage, his body became weakened, leading to bronchial pneumonia. Hence, the medical examiner concluded that Barberi had died from the combination of these conditions, brought about by the single blow to the head.

Meanwhile, on April 2, 1983, defendant, after being administered the *Miranda* warnings and agreeing to answer questions, had given a statement which was eventually received in evidence. He said that he had been in the boutique when he looked outside and saw two men talking. One of them came into the store and kept him "busy" by asking about the price of jeans, then had gone back outside and signaled his friend, who proceeded to take some shirts. When defendant next looked outside, he saw Turner holding one of the men, who was struggling to get away. Defendant ran outside and hit this man with a stick, once across the ribs and once in the head. He also kicked him.

Turner, in defendant's presence, also admitted that he had twice hit the man in the legs with a pipe. As the two sat together in the station house interview room, the door was opened, revealing Nenning, who was sitting in the next room. Turner turned to defendant and said, "See, I told you that's not the one we hit. It was the other one."

At the close of the People's case, defendant moved for a

trial order of dismissal because of the People's failure to prove that he struck the fatal blow. Although stating that "[this] issue [has] been bothering me since I called all counsel into the robing room the other day to discuss it", the court decided to "give the case to the jury and then rule on [defendant's] motion in the event there is a verdict against [him]." Defendant did not call any witnesses in his behalf.

On summation, the prosecutor asked the jury to ignore Nenning's testimony that Turner struck Barberi with a pipe, arguing that it did not "make sense". Instead, he argued, it was "more logical when you look at all of the facts * * * that in fact Bobby Turner came up behind Dominick and did knock him to the ground, but it wasn't by the blow by the pipe." In any event, the prosecutor stated, "[i]f [Turner] did swing the pipe at [Barberi's] head, he clearly didn't hit him hard enough to leave any type of wound". After the jury returned its guilty verdict, the court denied the motion for a trial order of dismissal.

The indictment charged defendant with having recklessly caused the death of Barberi by striking him about the head with a wooden club, thereby inflicting the wounds from which he died. After denying the People's request for a charge on accessorial liability, the court instructed the jury that defendant could be found guilty only if he had personally delivered the blow which caused Barberi's death. The propriety of that charge is, of course, beyond the scope of our review. (*People v Dlugash,* 41 NY2d 725, 731; *see also, People v Brown,* 40 NY2d 381, 393.)

In assessing the sufficiency of the evidence supporting a judgment of conviction, the People are entitled to have the evidence viewed in the light most favorable to them. (*People v Montanez,* 41 NY2d 53, 57; *see, People v Malizia,* 62 NY2d 755, 757, *cert denied* 469 US 932; *People v Kennedy,* 47 NY2d 196, 203.) The critical inquiry in any such assessment is whether, viewing the evidence in such light, any rational trier of the facts could have found that the defendant's guilt was proven beyond a reasonable doubt. (*Jackson v Virginia,* 443 US 307, 319.)

In considering this trial record, several significant facts emerge, uncontroverted. The testimony indicates that Barberi died as a result of a wound he received from a single blow to the head. The People's expert in forensic pathology, however, could not say whether the wound was caused by the metal pipe used by Turner or the wooden stick wielded by defendant, and Nenning, the People's only eyewitness, testified that

Turner struck Barberi in the back of the head with such force as to cause him to fall to the ground. Even though the record indicates that Barberi was repeatedly struck thereafter in and around the head, such testimony casts serious doubts upon the People's theory that defendant alone struck the fatal blow. In such circumstances, his conviction must be reversed and the indictment dismissed.

Nenning testified that he was standing beside Barberi outside the boutique when Turner struck Barberi from behind on the head with a lead pipe, causing him to fall on his face. Then, according to Nenning, defendant and another man rushed out of the boutique, and while the other man held him at bay, defendant and Turner turned Barberi onto his back and proceeded to beat him all over the front of his body, including his head. The beating, he estimated, lasted 5 to 7 minutes.

From this testimony, the People argue that defendant should be held culpable for the hematoma which was the result of a single blow to Barberi's head. Acceptance of this argument, however, requires a total rejection of a key aspect of Nenning's testimony—that Barberi was initially struck and felled by a blow to the back of his head by Turner, wielding a lead pipe. Contrary to the People's argument, it was precisely this part of Nenning's testimony which was the most reliable because, at that particular moment, his view was completely unimpeded and his attention undiverted.

Moreover, the medical testimony indicated that Barberi suffered only two major injuries—a wound on his head and one on his hand—injuries clearly inconsistent with a 5-to-7-minute beating. If the incident had occurred as Nenning described, Barberi's entire body would have been covered with bruises and cuts. Yet only one witness, one of Barberi's brothers, testified to bruises on the legs, chest and part of the back. The doctor who first examined Barberi upon his arrival at Bellevue Hospital immediately after the incident noted only a laceration to the head, a hematoma on the right hand and a scratch on the right shoulder. The neurologist in the intensive care unit at St. Clare's, who examined Barberi only two days after the incident, could not recall whether Barberi's body was bruised but testified that her notes failed to indicate the presence of any bruises or lacerations. The forensic pathologist found a wound on Barberi's scalp and an underlying epidural hematoma. She attributed the small reddish spots on

his chest, abdomen, and legs to the pneumonia which Barberi contracted from being on the respirator.

Nevertheless, the People argue, it was Nenning's testimony about the subsequent beating Barberi received at the hands of Turner and defendant that the jury credited. Nenning had testified that Barberi sustained more blows to the upper part of his body and that at the culmination of the assault blood shot out of his head. It was at that point, the People argue, that the blow leading to the hematoma was delivered. Moreover, they assert, it was defendant who struck that blow.

Nenning, however, never testified that defendant struck the blow which caused blood to shoot out of Barberi's head. Thus, even if the jury were to find that Barberi had been struck in the head after the initial blow by Turner, this record is barren of any proof that defendant struck that blow. According to Nenning, two men were beating Barberi and either one could have been responsible. Most importantly, given the testimony that Barberi had been turned on his back, it is difficult to hypothesize how he could have been struck in the lower back portion of the head between the left ear and the middle of the head.

To support the theory that defendant struck the fatal blow, the People also rely on his statement that he hit Barberi two times, once in the head and once in the ribs. Since, however, Barberi had been turned on his back, it is extremely unlikely that even if defendant did hit Barberi in the head that the blow would have been to the lower back region of the head. As for Turner's statement that he hit Barberi in the legs, to the admission of which defendant did not object, even if it were accepted as worthy of belief, it would be insufficient to sustain a conviction, given the state of the record.

The expert medical testimony adduced at trial also failed to implicate defendant as the person who struck the fatal blow. Although the forensic pathologist testified that Barberi died as a result of an epidural hematoma in combination with pneumonia, she was unable to conclude whether the hematoma was caused by a blow delivered by a wooden stick or lead pipe. She did believe, however, that blows to the parietal area usually come from behind and above—a factor more consistent with the hypothesis that the fatal blow occurred when Turner struck Barberi on the head with enough force to cause him to fall on his face.

In light of the conclusion reached herein, we do not reach defendant's other contentions of error.

Accordingly, the judgment of the Supreme Court, New York County (Herbert I. Altman, J.), rendered December 17, 1986, convicting defendant of manslaughter in the second degree and sentencing him to an indeterminate term of from 1⅓ to 4 years, should be reversed, on the law, and the indictment dismissed.

SANDLER, J. P., ASCH, MILONAS and ROSENBERGER, JJ., concur.

Judgment, Supreme Court, New York County, rendered on December 17, 1986, unanimously reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50, as in the interest of justice is required.